UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
BASSAM Y. ALGHANIM,

                    Plaintiff,              09 Civ. 8098 (NRB)

         - against -                       **MEMORANDUM AND ORDER**

KUTAYBA Y. ALGHANIM, et al.,

                    Defendants.
--------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## I. Introduction

Defendants Kutayba Y. Alghanim, Omar K. Alghanim, and Waleed Moubarak move to dismiss plaintiff Bassam Y. Alghanim's First Amended Complaint or, in the alternative, to stay this action pending arbitration pursuant to 9 U.S.C. §§ 3, 4, and 206.  For the reasons discussed below, defendants' motion to stay is granted.

## II. Background

### A. The Division of the Alghanim Business Empire

According to the First Amended Complaint (the "complaint"), in the 1970s, Kutayba Y. Alghanim ("Kutayba") and Bassam Y. Alghanim ("Bassam") jointly assumed control of the business empire that their father had founded.  Compl. ¶ 33.  In 2007, following the increased involvement in this business empire of Omar K. Alghanim ("Omar"), Kutayba's eldest son, Kutayba and

Bassam began to argue over the future of the family enterprise. Id. at ¶ 36.  By 2008, their dispute had reached an impasse, and the brothers agreed to divide their commonly-owned property, which had grown over the years to encompass business interests in Kuwait and elsewhere that were worth billions of dollars. Id. at ¶¶ 33, 36.  In March 2008, following disagreement over how to divide this commonly-owned property, Kutayba and Bassam, the latter allegedly under pressure from Kutayba and "high-ranking Kuwaiti officials,"[1] entered into three agreements.  Id. at ¶¶ 37-38.

First, on March 12, 2008, the brothers entered into a "General Points of Settlement," which addresses, among other things, the division of their ownership stake in a commercial bank.  See First Al-Essa Decl. Ex. A.  This agreement, which does not contain a dispute-resolution clause, does not figure prominently in the parties' submissions.

Second, on March 12, 2008, the brothers entered into a broader "Agreement" that addresses the overall division of their commonly-owned property (the "March 12 Agreement").  This agreement contains a dispute-resolution clause:

> Should any dispute arise in the future between the two Parties, the final advice, opinion and decision relating thereto will be issued by his highness Sheikh Nasser AL [sic] Mohamed Al Ahmed Al Jaber Al Saba.

---

[1] In opposing defendants' motion, plaintiff does not argue that he entered into the dispute-resolution clauses at issue because he was coerced or that he otherwise did not consent to their terms.

First Al-Essa Decl. Ex. B ¶ 7.

Third, on March 27, 2008, the brothers entered into a "Memorandum of Understanding" that expressly integrates and explains the General Points of Settlement and March 12 Agreement (the "MOU") (and together with the General Points of Settlement and March 12 Agreement, the "March Agreements"). The MOU sets out relatively more detailed terms that address the actual division of the brothers' commonly-owned property.[2] The MOU also contains a dispute-resolution clause:

> [Kutayba] and [Bassam] hereby confirm their agreement that any dispute arising in the future between us related to the subject matter of this agreement shall be finally decided by H.H. Sheikh Nasser Mohammed al-Ahmed al-Jaber Al-Sabah.

First Al-Essa Decl. Ex. C ¶ 15.

In March 2008, Sheikh Nasser Mohammed al-Ahmed al-Jaber Al-Sabah served as Prime Minister of Kuwait, as he does to the present day. In addition to the role that the dispute-resolution clauses anticipated for him, the Kuwaiti Prime Minister also served as witness for each of the March Agreements, none of which contains a choice-of-law clause.

Since entering the March Agreements, Kutayba and Bassam have allegedly remained locked in a bitter dispute over the division of the commonly-owned property. Compl. ¶ 42.

---

[2] On December 4, 2009, we granted the application of defendants Kutayba and Omar to file the MOU under seal, an application to which plaintiff had consented.

**B. The Kuwaiti Cases**

In connection with this ongoing dispute, Bassam has brought nine cases in Kuwaiti courts.   In March 2009, Bassam filed six suits seeking to place commonly-owned property into judicial receivership.   See First Al-Essa Decl. ¶¶ 5-7.   All six suits were dismissed for reasons that do not appear relevant here.

Later in March 2009, Bassam filed two suits seeking (i) an accounting of the recent profits of Yusuf Ahmed Alghanim and Sons W.L.L. ("YAAS") and Alghanim Industries Co. W.L.L. ("Alghanim Industries"), two entities within the brothers' business empire, and (ii) payment of his share of those recent profits.   See First Al-Essa Decl. Exs. J, L.   On November 2, 2009, in the action involving YAAS (the "YAAS Accounting Action"), the Kuwaiti Court of First Instance dismissed the suit against Kutayba and YAAS because it concluded that the MOU contained an arbitration clause and that it thus lacked jurisdiction.   See First Al-Essa Decl. Ex. K.   Its findings were affirmed on Bassam's appeal to the Kuwaiti Appellate Court, an intermediate court of appeal.   See Third Al-Essa Decl. Ex. 1. As detailed below, Bassam's ensuing appeal to the Kuwaiti Court of Cassation, the highest court of appeal, bears on the resolution of the pending motion.[3]

---

[3] On November 2, 2009, Bassam abandoned the parallel action involving Alghanim Industries.   See First Al-Essa Decl. Ex. M.

Finally in October 2009, Bassam filed one suit seeking a declaration that he owns 50% of YAAS.  First Al-Essa Decl. Ex. N.  The Kuwaiti Court of First Instance similarly dismissed the suit against Kutayba and YAAS in favor of arbitration, a decision that the Kuwaiti Appellate Court affirmed and from which Bassam has apparently not further appealed.  <u>See</u> Fourth Al-Essa Decl. ¶ 2.

## C. The Email-Hacking Case

On September 22, 2009, Bassam brought suit in this Court. In the complaint, he alleges that Kutayba, Omar, Waleed Moubarak ("Waleed"), YAAS, and Alghanim Industries engaged in an email-hacking scheme beginning in July 2008 in which they successfully endeavored together with others to gain access to his personal email accounts for the purpose of gaining a strategic advantage in the ongoing dispute over the division of the brothers' commonly-owned property.  <u>See</u> Compl. ¶ 14.  Bassam named YAAS and Alghanim Industries themselves as defendants because they allegedly made payments to facilitate the email-hacking scheme at Kutayba and Omar's direction.  <u>Id.</u> at ¶ 91.  As the complaint notes, Kutayba is the Chairman, Omar is the Chief Executive Officer, and Waleed is the Chief Legal Officer of both YAAS and Alghanim Industries.  <u>Id.</u> at ¶¶ 23-28.  Bassam alleges ten causes of action against these defendants premised on violation of the Stored Communications Act, Computer Fraud and Abuse Act,

Wiretap Act, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), as well as common law and state statutory law.

### D. The Pending Motion

On July 1, 2010, the parties agreed to the denial without prejudice of defendants' initial motion to dismiss the complaint, or, in the alternative, stay this action pending arbitration in order to permit the parties and this Court to learn the decision of the Kuwaiti Court of Cassation in the YAAS Accounting Action before proceeding further.[4]  See Oral Argument Tr. 7:3-8:14, July 1, 2010.

On February 15, 2011, the Kuwaiti Court of Cassation affirmed the decision of the lower courts in the YAAS Accounting Action and dismissed the suit in favor of arbitration.  See Fifth Al-Essa Decl. ¶ 4.  It held that the dispute-resolution clauses in the March Agreements are arbitration clauses that reflect "the parties wish to resolve by arbitration any future dispute concerning the subject matter of the MOU."  Fifth Al-Essa Decl. Ex. 2 9.

---

[4] Initially, Waleed moved independently from Kutayba and Omar for the same relief, see Park Decl. ¶ 3, but in subsequent rounds of briefing, these defendants have made joint submissions.  See infra note 5.  YAAS and Alghanim Industries were not movants in the initial motion, are not movants in the pending motion, and further reference to "defendants" does not include them. Pursuant to a stipulation of the parties that this Court approved on January 11, 2010, YAAS and Alghanim Industries have twenty-one days from the date of this Memorandum and Order to answer, move, or otherwise respond to the complaint.

On March 9, 2011, defendants accordingly renewed their motion, which is now ripe for decision.[5]

### III. Discussion

Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 et seq., implements the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (entered into force Dec. 29, 1970) (the "Convention"). Distilling the requirements of the Convention as ratified and as enabled in Chapter 2, the Second Circuit has held that a district court will have jurisdiction to enforce an arbitration agreement pursuant to the Convention where that arbitration agreement (1) is a "written agreement"; (2) "provide[s] for arbitration in the territory of a signatory of the [C]onvention"; (3) is "commercial" in its subject matter; and (4) is not "entirely domestic in scope." Smith/Enron Cogeneration Ltd. P'ship, Inc., 198 F.3d 88, 92 (2d Cir. 1999).

---

[5] In connection with the pending motion, the parties' have submitted multiple rounds of briefing. Any references to these submissions will be abbreviated as follows: Defendants Kutayba K. Alghanim and Omar K. Alghanim's Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint or, in the Alternative, Stay this Action Pending Arbitration ("Defs. Br."); Memorandum of Law in Opposition to Defendants' Motions to Dismiss and/or Stay this Action Pending Arbitration ("Pl. Opp'n"); Defendants' Joint Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint or, in the Alternative, Stay this Action Pending Arbitration ("Defs. Reply"); Supplemental Memorandum of Law in Further Opposition to Defendants' Motions to Dismiss and/or Stay this Action Pending Arbitration ("Pl. Supp. Br."); Defendants' Joint Supplemental Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint or, in the Alternative, Stay this Action Pending Arbitration ("Defs. Supp. Br."); Second Supplemental Memorandum of Law in Opposition to Defendants' Renewed Motion to Dismiss and/or Stay this Action Pending Arbitration ("Pl. Second Supp. Br."); and Defendants' Joint Response to Plaintiff's Second Supplemental Memorandum of Law ("Defs. Second Supp. Br.").

The parties do not expressly address whether the dispute-resolution clauses in the March Agreements satisfy these four requirements, but both plaintiff and defendants clearly assume the applicability of the Convention.  See Defs. Br. 9-10; Pl. Opp'n 2.  We are similarly satisfied that the Convention applies and that there exists jurisdiction under Chapter 2 of the FAA.

Defendants style their motion as one to dismiss the complaint or, in the alternative, to stay this action pending arbitration pursuant to 9 U.S.C. §§ 3, 4, and 206.  Though § 3 is part of Chapter 1 of the FAA it is applicable to cases under Chapter 2 and the Convention.  See Energy Transp., Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186, 201 (S.D.N.Y. 2004) (noting Chapter 2 of the FAA does not make "specific reference to the court's power to stay the action while arbitration proceeds" before stating "[c]onsequently § 3 may be fully incorporated into . . . Chapter 2"); 9 U.S.C. § 208 ("Chapter 1 applies to actions and proceedings brought under [Chapter 2] to the extent that [Chapter 1] is not in conflict with [Chapter 2] or the Convention").

Section 3 provides in relevant part that a court, "upon being satisfied that the issue involved in [a] suit . . . is referable to arbitration under [a written arbitration agreement], shall on application of one of the parties stay the trial of the action until such arbitration has been had."  9

U.S.C. § 3.[6]  Unlike § 3, § 4, which is also part of Chapter 1 of the FAA, does not appear to have any application here because it conflicts with a provision of Chapter 2, namely § 206.[7] Section 206 provides, "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.

We emphasize at the outset that defendants do not seek by way of relief an order directing the parties to arbitrate, notwithstanding their reliance on § 206.  Rather, defendants ask this Court to dismiss the complaint, or, in the alternative,

---

[6] The "shall" in § 3 conveys a non-discretionary mandate to stay the action. See HG Estate, LLC v. Corporacion Durango S.A. De de C.V., 271 F. Supp. 2d 587, 596 (S.D.N.Y. 2003) (noting § 3 "mandates a stay of litigation if 'the issue involved is referable to arbitration'").

[7] Section 4 provides in relevant part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition [the district court] for an order directing that such arbitration proceed in the manner provided for in such agreement. . . .  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed."

9 U.S.C. § 4.  While the dispute-resolution clauses of the March Agreements do not actually specify an arbitral forum, the parties in their submissions appear to interpret them to provide that any arbitration conducted by the Kuwaiti Prime Minister is to occur in Kuwait.  If so, then § 4, which would require arbitration in the Southern District of New York conflicts with § 206.  Such a conflict, pursuant to 9 U.S.C. § 208, renders § 4 inapplicable.  See Energy Transport, Ltd. v. M.V. San Sebastian, 348 F. Supp. 2d 186, 201 (S.D.N.Y. 2004) ("'[i]f the [arbitration] agreement calls for arbitration outside of the district in which the action is brought, the limits of § 4 directly conflict with the district court's powers under § 206 and § 208 would render § 4 inapplicable'") (quoting Jain v. de Mere, 51 F.3d 686, 690 (7th Cir. 1995)).

stay this action pending arbitration.  In this case, were we to dismiss the complaint, we would be inclined to do so without prejudice to its renewal following the arbitration.  In light of the "liberal federal policy favoring arbitration agreements" and the Second Circuit's preference for avoiding "[u]nnecessary delay of the arbitral process through appellate review," we thus only inquire here whether an interlocutory order granting a stay of this action is required and do not further consider dismissing the case.  Salim Oleochemicals v. M/V Shropshire, 278 F.3d 90, 93 (2d Cir. 2002) (internal quotations marks omitted).

In deciding whether to stay this action, we have "essentially four tasks." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987).  First, we "must determine whether the parties agreed to arbitrate." Id. Second, if they did agree, then we "must determine the scope of that agreement." Id.  Third, "if federal statutory claims are asserted, [we] must consider whether Congress intended those claims to be nonarbitrable." Id.  Fourth, "if [we] conclude[] that some, but not all, of the claims in the case are arbitrable, [we] must then determine whether to stay the balance of the proceedings pending arbitration." Id.

The parties devote relatively little attention to the first of these inquiries insofar as it concerns the March Agreements between Bassam and Kutayba.  With that said, Bassam strongly

disputes that Omar and Waleed can compel him to arbitrate his claims against them on the strength of the March Agreements to which they are not signatories.  The second of these inquiries is the focus of considerable attention, however, with the parties arguing over whether the allegations of the complaint lie within the scope of the dispute-resolution clauses in the March Agreements.  The third of these inquires has come to focus on whether the asserted claims, assuming they are "in scope," are nonetheless nonarbitrable due to external constraints not stemming from contractual interpretation.  While plaintiff does not appear to dispute the proposition that Congress intended to permit arbitration of his federal statutory claims, he maintains, however, that his asserted claims are nonarbitrable pursuant to Kuwaiti law, which, if applicable, would assertedly have consequences for his ability to vindicate his federal statutory claims in the foreign arbitral forum.  Though not bearing on congressional intent, such concerns regarding arbitral fora have been addressed by the Second Circuit within the third of these inquiries in the parallel context of compelling arbitration.  See JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 181-82 (2d Cir. 2004) (considering whether English law would permit vindication of plaintiff's federal statutory claims in the course of the third of these inquiries).

Before we can answer the four substantive issues set out above, however, we must address the question of which body of law should govern analysis of the March Agreements.

## A. Choice of Law

The March Agreements do not include a choice-of-law clause,[8] and the parties disagree about which source of law this Court should adopt in interpreting them and their dispute-resolution clauses.  Plaintiff argues for Kuwaiti law.  Defendants argue for "federal law."[9]  Both parties agree, however, that their positions are fully vindicated whether federal law or Kuwaiti law applies.  See Defs. Br. 11; Pl. Opp'n 5, 6.  We find that the choice of law is outcome determinative only with regard to the question of whether Omar and Waleed, the non-signatories to the March Agreements, can require plaintiff to arbitrate his claims against them.  See Parts III.B.2.i-ii, infra.  We also find, however, that we would stay the action against Omar and Waleed regardless of which source of law applies.  See Part III.E, infra.  Because the choice of law selection does not

---

[8] As the Seventh Circuit recently observed in a case under the Convention where the arbitration agreement similarly did not include a choice-of-law clause, due to "the growing trend to include choice-of-forum and choice-of-law clauses in sophisticated commercial agreements, there is scant precedent available suggesting what law should be applied to interpret the substantive provisions of an agreement that is covered by the Convention but contains no choice-of-law provision."  Certain Underwriters at Lloyd's London v. Argonaut Ins. Co., 500 F.3d 571, 577 (7th Cir. 2007).

[9] It is not entirely clear what either of the parties contemplate their references to "federal law" or, in the alternative, "U.S. law" to signify. Both parties cite federal case law pertaining to arbitration agreements under the FAA, however, and we accordingly look to this body of decisions.

alter the bottom-line result, we do not need to decide whether federal law or Kuwaiti law governs interpretation of the March Agreements.

It bears emphasis, however, that the broader context in which this choice-of-law question must be considered is that of the Convention and FAA, which contain governing presumptions regardless of whether federal law or Kuwaiti law is adopted. In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), a case within the purview of the Convention, the Supreme Court stated:

> [A] court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute . . . by applying the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." . . . And that body of law counsels "that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration . . . . The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."

473 U.S. at 626 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). In Moses H. Cone, the Supreme Court had described the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." 460 U.S. at 24. Further, in Perry

v. Thomas, 482 U.S. 483 (1987), the Supreme Court clarified that "state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Id. at 492 n. 9 (emphasis in original). As the Second Circuit has stated in interpreting Perry in the Convention context, the FAA "preempts state law which treats arbitration agreements differently from any other contracts." Progressive Cas. Ins. Co. v. CA Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir. 1993). To the extent that plaintiff argues that a presumption contrary to that expressed in the FAA is present in Kuwaiti law and applies when analyzing the March Agreements, his argument is unavailing. See Pl. Opp'n 3 (arguing "Kuwaiti law construes arbitration agreements narrowly"). When interpreting the terms of the March Agreements pursuant to Kuwaiti law, we only consider that body of Kuwaiti law that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally" but not Kuwaiti law that "treats arbitration agreements differently from any other contracts."

## B. The Agreement to Arbitrate

### 1. The March Agreements

#### i. Federal Law

In the March 12 Agreement, Bassam and Kutayba agreed that "[s]hould any dispute arise in the future between [them], the final . . . decision relating thereto will be issued by" the Prime Minister of Kuwait.  First Al-Essa Decl. Ex. B ¶ 7.  In the MOU, they agreed to submit "any dispute . . . related to [its] subject matter" to "be finally decided" by the Prime Minister of Kuwait.  First Al-Essa Decl. Ex. C ¶ 15.

The FAA does not define an arbitration agreement, though it is clear from its terms and those of the Convention that such an agreement must be in writing.  See 9 U.S.C. § 2 ("[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid"); Convention Art. II(1) ("shall recognize an agreement in writing").  The Convention moreover requires a signed writing.  Convention Art. II(2) ("'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters"); Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 217 (2d Cir. 1999), partially abrogated on other grounds by Sarhank Group v. Oracle Corp., 404 F.3d 657, 660 n. 2 (2d Cir. 2005) (construing the "agreement in writing"

15

requirement to mean that an arbitration clause is enforceable only if found in a signed writing or an exchange of letters). Such a written provision need not refer to "arbitration" or include the words "final" or "binding." See McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co., 858 F.2d 825, 830-31 (2d Cir. 1988) (noting "[i]t is, in our estimation, irrelevant that the contract language in question does not employ the word 'arbitration' as such" or term the third-party decision maker's "conclusions 'final' or 'binding'").

Thus, applying federal law, the dispute-resolution clauses of the March 12 Agreement and MOU, both of which Bassam and Kutayba signed, are plainly arbitration clauses.

### ii. Kuwaiti Law

The same conclusion is reached applying Kuwaiti law. In its recent decision in the YAAS Accounting Action, the Kuwaiti Court of Cassation, Kuwait's highest tribunal, resolved the issue when it held that the dispute-resolution clauses in the March Agreements are arbitration clauses.

> Whereas these two articles have unequivocally and clearly disclosed the parties' intent to refer any dispute arising between them in the future concerning the termination and dissolution of their partnership to H.H. Sheikh Nasser Mohammed al-Ahmad al-Jaber Al-Sabah for passing a final and binding decision, not for conciliating between them or bringing the two viewpoints closer, and suggesting solutions leaving the decision of taking them into consideration or not to the sole discretion of the parties; rather, the parties have agreed that His Highness decides between

> them by issuing a decision binding on the parties even
> if both or one of the parties are not happy with such
> decision, said agreement could only be interpreted
> that the parties wish to resolve by arbitration any
> future dispute concerning the subject matter of the
> MOU.

Fifth Al-Essa Decl. Ex. 2 8-9.[10]

## 2. The Non-Signatories

### i. Federal Law

Whether Omar and Waleed, non-signatories to the March Agreements, can require plaintiff to arbitrate his claims against them presents a closer question and one on which federal law and Kuwaiti law yield different results.

Pursuant to federal law, in the particular context of the Convention, the fact that non-signatories did not sign a written arbitration agreement "does not foreclose the application of the well-established contract and agency principles under which nonsignatories sometimes can be obligated by, or benefit from agreements signed by others." Borsack v. Chalk & Vermilion Fine Arts, Ltd., 974 F. Supp. 293, 301 (S.D.N.Y. 1997) (finding signatory defendants could compel arbitration against non-signatory plaintiff). See also Cargill Intern. S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1020 (2d Cir. 1993) (suggesting that were a non-signatory found to be a third-party beneficiary "it may be proper for the district court to enforce the

---

[10] Kuwaiti Court of Cassation, Decision No. 155/2010, Feb. 15, 2011.

arbitration agreement against [a signatory]"). Thus the fact that Omar and Waleed are non-signatories to the March Agreements does not by itself foreclose their resort to arbitration.

Non-signatories seeking to compel a signatory to arbitrate a dispute find support in the Second Circuit in the principle of equitable estoppel, which requires a two-part inquiry. First, "a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them [must] disclose[] that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115, 126-27 (2d Cir. 2010) (quoting Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co., 271 F.3d 403, 406 (2d Cir. 2001)). Second, "'there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.'" Id. at 127 (quoting Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 359 (2d. Cir. 2008)).

The first of these inquiries addresses "intertwinedness." Here, the complaint does not materially distinguish between signatory defendant Kutayba and non-signatory defendants Omar

and Waleed pleading the ten counts of the complaint against all three.  In what the Second Circuit has acknowledged is a "fact-specific" inquiry, see JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 178 (2d Cir. 2004), this fact distinguishes the cases to which plaintiff principally analogizes.  See Denney v. Jenkens & Gilchrist, 412 F. Supp. 2d 293, 299 (S.D.N.Y. 2005) (causes of action alleged against signatory and non-signatory defendants were not identical); Stechler v. Sidley, Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580, 591 (S.D.N.Y. 2005) (signatory and non-signatory defendants "played different and distinct roles in the alleged conspiracy").  To whatever extent the complaint does distinguish between Kutayba, Omar, and Waleed, such differentiation is muted by its allegation that "[i]n taking the actions complained of . . . [d]efendants acted in concert with each other" and "[i]n so doing, each was the agent of the other and each is responsible for all the actions of the others in furtherance of their conspiracy." Compl. ¶ 29.

In this case, whether the claims against Omar and Waleed are sufficiently intertwined for the purpose of equitable estoppel is thus effectively the same question as whether the identical claims against Kutayba are within the scope of the March Agreements.  See JLM, 387 F.3d at 178 (finding the claims against non-signatories "undeniably intertwined" with the relevant contracts where "as . . . already noted" the same

claims were found to be within the scope of arbitration clauses).  See also Ragone, 595 F.3d at 128 ("there is . . . no question that the subject matter of the dispute between [plaintiff] and [signatory defendant] is factually intertwined with the dispute between [plaintiff] and [non-signatory defendant].  It is, in fact, the same dispute").  As discussed in Part III.C.1, it is clear that the issues that Kutayba is seeking to resolve in arbitration are within the scope of the March Agreements.  "Intertwinedness" thus exists.

The second of these inquiries addresses the relationship between plaintiff and the non-signatories vis-a-vis the March Agreements.  We find both Ross v. American Express Co., 547 F.3d 137 (2d Cir. 2008) and Ragone v. Atlantic Video at Manhattan Center, 595 F.3d 115 (2d Cir. 2010) particularly instructive here because they illuminate the factors at issue.  In Ross, the Second Circuit found that plaintiffs, who entered into credit card agreements with Visa, Mastercard, and Diners Club (the "Issuing Banks") that contained arbitration clauses, were not estopped from refusing to arbitrate claims relating to the subject matter of those agreements against defendant American Express.  While finding it "indisputable that the subject matter of the dispute between the parties . . . is related to the subject matter" of the contracts containing the arbitration clauses, see id. at 146, the Second Circuit held that "the

20

further necessary circumstance of some relation between Amex and the plaintiff's sufficient to demonstrate that the plaintiffs intended to arbitrate this dispute with Amex is utterly lacking here." Id. A competitor, rather than a corporate affiliate, of the Issuing Banks, "Amex did not sign the [contracts], it [was] not mentioned therein, and it had no role in their formation or performance." Id. See also id. at 148 ("a complete stranger to the plaintiffs' [contracts,] [Amex] did not sign them, it is not mentioned in them, and it performs no function whatsoever relating to their operation").

Following Ross, in Ragone the Second Circuit found that plaintiff, a make-up artist whose employment with a television production company was subject to an arbitration agreement, was estopped from refusing to arbitrate her sexual harassment claims against ESPN, a cable sports television news service and client of her employer against whom she also brought sexual harassment claims. See 595 F.3d at 126-28. The Second Circuit noted that "ESPN is not mentioned in the arbitration agreement, or in any other document relating to [plaintiff's] initial employment that is contained in the record" and that "therefore [this is] not a case where ESPN is 'linked textually' to [plaintiff's] claims." Id. at 127 (quoting Choctaw, 271 F.3d at 407). Nevertheless, the Second Circuit, found that "as set forth in [the] complaint, it is plain that when [plaintiff] was hired by [her employer],

she understood ESPN to be, to a considerable extent, her co-employer." Id. Expressly contrasting Ross, the Second Circuit implicitly emphasized that ESPN was far from a stranger to the arbitration agreement that the plaintiff was fully aware applied to an employment relationship in which ESPN would necessarily be and was in fact thoroughly involved. Id. at 127-28.

Unlike in Ross, Omar is far from a "stranger" to the March Agreements. As plaintiff alleges, Omar's rise in the business empire gave rise to the dispute that led the brothers to divide their commonly-owned property. See Compl. ¶ 36. As plaintiff also alleges, Omar is the Chief Executive Officer of two of the entities within that business empire, YAAS and Alghanim Industries. See id. at ¶¶ 26-27. As an heir to Kutayba, Omar is also interested in the division of the brothers' commonly-owned property, a self-evident fact that plaintiff implicitly acknowledges in the complaint and of which he was certainly aware in March 2008. See id. at ¶ 86 (noting "[d]efendants [Kutayba] and [Omar] stood to benefit the most from this scheme"). As in Ragone, though Omar is not "'linked textually'" to the March Agreements, 595 F.3d at 127, at the time plaintiff entered into them, he was aware that Omar shared substantially in Kutayba's interest in them and would continue to do so during their performance. In fact, plaintiff acknowledges that his dispute over performance of the March Agreements is as much with

Omar as Kutayba.  See Compl. ¶ 77 ("[d]efendants [Kutayba] and [Omar] have illegally accessed and recorded [p]laintiff's litigation and business strategy with the respect to the multi-billion dollar disputes between them").  Given the known identity of interests between Kutayba and Omar, Omar's position alongside his father in the business empire, and the fact that Omar previously stood and continues to stand at the heart of the dispute between plaintiff and Kutayba over their commonly-owned property, it is equitable to estop plaintiff from refusing to arbitrate against Omar because of his "knowledge that [he] would extensively treat with [Omar]" in implementing the March Agreements.  595 F.3d at 128.

While Waleed is certainly not a "stranger" to the March Agreements, having played a "role in their formation [and] performance," 547 F.3d at 146, there are no allegations in the complaint to suggest that plaintiff would reasonably have believed when he entered the March Agreements with Kutayba that he was agreeing to arbitrate disputes that might arise with Waleed.  While Waleed did advise Kutayba during the negotiation of the March Agreements, it is unclear whether plaintiff was contemporaneously aware of this fact.  See Park Decl. ¶ 6.  Plaintiff certainly knew, however, of Waleed's position as the Chief Legal Officer of YAAS and Alghanim Industries, see Compl. at ¶ 26-27, and more significantly became aware of his ongoing

23

role as Kutayba's attorney with regard to the performance of the
March Agreements and the disputes that have arisen from their
implementation.  See Compl. ¶ 78 (stating Waleed, "[Kutayba]'s
and [Omar]'s legal counsel . . . improperly used the stolen
information in conducting negotiations and litigation against
[plaintiff] and [in] dealing with the outside counsel retained
to represent [p]laintiff").  Nonetheless, unlike Omar, Waleed is
not Kutayba's son and his involvement in the broader disputes
concerning the March Agreements is only as an agent.

Though the principle of equitable estoppel does not aid
Waleed, the principal of agency does permit him to arbitrate
against plaintiff.  The Second Circuit has recently acknowledged
that it "remains an open question" whether non-signatories may
compel arbitration pursuant to any theory aside from equitable
estoppel.  Ross, 547 F.3d at 143 (citing Astra Oil Co., Inc. v.
Rover Navigation, Ltd., 344 F.3d 276, 279 n. 2 (2d Cir. 2003)).
Until this question is resolved, however, "'[c]ourts in this and
other circuits consistently have held that employees or
disclosed agents of an entity that is a party to an arbitration
agreement are protected by that agreement.'"  Campaniello
Imports, Ltd. v. Saporiti Italia, S.p.A., 117 F.3d 655, 668 (2d
Cir. 1997) (quoting Roby v. Corp. of Lloyd's, 996 F.2d 1353,
1360 (2d Cir. 1993)).  Waleed's involvement in implementing the
March Agreements and in the alleged execution of the email-

hacking scheme stems entirely from his position as counsel on behalf of Kutayba and is a sufficient basis for his resort to arbitration.  See Compl. ¶ 87 (describing Kutayba and Omar as Waleed's "superiors" and the latter's activities in the email-hacking scheme as conducted "as counsel" for Kutayba and Omar). See also Washington v. William Morris Endeavor Entm't, L.L.C., No. 10 Civ. 9647 (PKC), 2011 WL 3251504, at *9 (S.D.N.Y. July 20, 2011) (permitting non-signatory employees to compel arbitration in part due to their status as employees and citing Campaniello); Hamerslough v. Hipple, No. 10 Civ. 3056 (NRB), 2010 WL 4537020, at *2-3 (S.D.N.Y. Nov. 4, 2010) (finding non-signatory directors to be agents of their corporation who could compel arbitration and citing Roby).  Plaintiff's argument that Waleed is not a disclosed agent with respect to the March Agreements is difficult to understand given his allegations that Waleed acted as Kutayba's counsel in their implementation.  See Compl. ¶ 78.[11]

Pursuant to federal law, therefore, plaintiff cannot avoid arbitrating against Omar and Waleed.[12]

---

[11] We agree with defendants that agency is also relevant to buttressing Omar's ability to compel arbitration.  See Defs. Reply 18-19.

[12] To the extent that plaintiff argues that Omar's and Waleed's participation in the alleged email-hacking scheme forecloses their access to equitable relief, his argument is without merit.  See JLM, 387 F.3d at 171 (noting "our determination of the arbitrability of the claims asserted by [plaintiff] does not in any way rest upon the strength of those claims").  Furthermore, we find unconvincing plaintiff's argument that Omar is barred from compelling arbitration because of positions adopted in proceedings before the Kuwaiti

### ii. Kuwaiti Law

We now consider this same issue under Kuwaiti law. Defendants have consistently argued that the successive decisions of the Kuwaiti courts in the YAAS Accounting Action support their position that non-signatories may compel arbitration pursuant to Kuwaiti law. See, e.g., Defs. Br. 24-25; Second Nasser Decl. ¶ 32. In the most recent decision, the Kuwaiti Court of Cassation addressed the status of YAAS with respect to the March Agreements in the following passage:

> The fact that YAAS has a legal personality does not preclude, since it is composed of two partners, the claimant and the second defendant, and is managed by both partners, that it is a constituent element of the partnership which the parties agreed to terminate via arbitration and therefore YAAS constitutes with the other elements of the partnership the subject of the arbitration and are not third parties to it.

Fifth Al-Essa Decl. Ex. 2 9-10.[13]  Defendants interpret this holding to provide that "Bassam's claims against YAAS--which itself was not a signatory to the March 12 Agreement or the MOU--are within the scope of the parties' agreements to arbitrate because the relatedness of the parties, contracts and controversies is close." Fifth Al-Essa Decl. ¶ 6(c). Plaintiff, through his expert Ms. Ali, vigorously disputes defendants' characterization of the holding. See Third Ali Decl. ¶¶ 10-14.  We find defendants' interpretation

---

Stock Exchange that relate to the obligations pursuant to the March Agreements of entities within the business empire. See Pl. Supp. Br. 10-11.
[13] Kuwaiti Court of Cassation, Decision No. 155/2010, Feb. 15, 2011.

unpersuasive.   As plaintiff argues, it seems clear that the Kuwaiti Court of Cassation based its finding on the fact that YAAS forms part of the <u>subject matter</u> of the March Agreements, <u>see</u> Third Ali Decl. ¶ 12, not because of any "relatedness of the parties, contracts and controversies."   Because Omar and Waleed are not the subject matter of the March Agreements, the YAAS Accounting Action provides no support for their argument that they can rely on the March Agreements.

Without the decisions of the Kuwaiti courts in the YAAS Accounting Action, defendants are left without any substantial authority to sustain the premise that Omar and Waleed, as "third parties" to the arbitration clauses may require plaintiff to arbitrate against them pursuant to Kuwaiti law.

In contrast, plaintiff summons authority that non-signatories cannot compel arbitration pursuant to Kuwaiti law. Article 173 of the Civil and Commercial Procedure Code states, "[a]rbitration may not be established, save in writing."   First Al-Samdan Decl. Ex. E.   <u>See</u> Pl. Opp'n 28 (citing Article 173 for this proposition).   Article 203 of the Civil Code in turn provides, "[c]ontracts only benefit or harm the contracting parties and their successors."   First Ali Decl. Ex. D.   It appears clear on the basis of a treatise on Kuwaiti law that an "arbitration clause shall not be obligatory for other parties

who did not accept it." First Ali Decl. Ex. E.[14] Significantly, the converse, which is relevant here, also seems true. In another treatise on Kuwaiti law, the authors state, "[i]t is . . . permissible to join a third party or ha[ve] their joinder approved if the arbitration agreement does not permit this and the joined person accepts." First Ali Decl. Ex. J 130.[15]

The most difficult hurdle for defendants to overcome, however, is the holding of the Kuwaiti Court of Cassation in the YAAS Accounting Action itself. It is implicit in this holding that if YAAS was not a constituent element of the arbitration agreement, then it would be a third party to the arbitration agreement. Defendants Omar and Waleed do not persuasively argue why they are not third parties to the arbitration agreement or why, as third parties, they may nonetheless compel arbitration.

While this conclusion appears to make the choice of governing law outcome determinative at least with respect to Omar and Waleed, as discussed in Part III.E, we find that plaintiff's claims against them should be stayed in any event pending arbitration of his claims against Kutayba regardless of what law applies.

---

[14] AZMI ABDEL FATTAH ATTIYA, QANOON AL TAHKIM AL KUWAITI (1st ed. 1990).

[15] SAID AHMED MOHAMMED & ABDUL SATAR AL MULLAH, AL TAHKIM AL ADI IN ISLAMIC SHARIA AND KUWAITI LAW (1st ed. 1998).

## C. The Scope of the Agreement to Arbitrate

### 1. Federal Law

We now consider whether plaintiff's claims are within the scope of the arbitration clauses in the March Agreements, first answering this question under federal law.  In Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001), the Second Circuit established a standard approach "[t]o determine whether a particular dispute falls within the scope of an agreement's arbitration clause":

> First, recognizing there is some range in the breadth
> of arbitration clauses, a court should classify the
> particular clause as either broad or narrow. . . .
> Next, if reviewing a narrow clause, the court must
> determine whether the dispute is over an issue that is
> on its face within the purview of the clause, or over
> a collateral issue that is somehow connected to the
> main agreement that contains the arbitration clause.
> . . . Where the arbitration clause is narrow, a
> collateral matter will generally be ruled beyond its
> purview. . . . Where the arbitration clause is broad,
> there arises a presumption of arbitrability and
> arbitration of even a collateral matter will be
> ordered if the claim alleged implicates issues of
> contract construction or the parties' rights and
> obligations under it.

Id. (internal citations and quotation marks omitted).

An arbitration clause covering "'[a]ny claim or controversy arising out of or relating to th[e] agreement,'" is "the paradigm of a broad clause."  Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995).  Furthermore, "[a]n arbitration clause covering claims 'relating to' a

contract is broader than a clause covering claims 'arising out of' a contract." Int'l Talent Group, Inc. v. Copyright Mgmt., Inc., 629 F. Supp. 587, 592 (S.D.N.Y. 1986). See also Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 845, 848 (2d Cir. 1987) (arbitration clause covering "[a]ny controversy arising out of or relating to this contract" was "even broader" than one covering "[a]ll claims and disputes of whatever nature arising under this contract").

Where an arbitration clause is broad, the resulting "presumption of arbitrability . . . is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation marks omitted). This principle reflects the fact that the FAA articulates "a strong federal policy favoring arbitration as an alternative means of dispute resolution," Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001), which policy "applies with particular force in international disputes." Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 654 (2d Cir. 2004).

Still, arbitration under the FAA "is a matter of consent, not coercion." Stolt-Nielsen S.A. v. AnimalFeeds International Corp., 130 S. Ct. 1758, 1773 (2010) (internal quotation marks

omitted).    Thus, "[w]hile the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA 'was to make arbitration agreements as enforceable as other contracts, but not more so.'" JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 171 (2d Cir. 2004) (quoting Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 364 (2d Cir. 2003)) (emphasis and brackets in original).

Finally, "'[i]n determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted.'" Oldroyd v. Elmira Sav. Bank, F.S.B., 134 F.3d 72, 77 (2d Cir. 1998) (quoting Genesco, 815 F.2d at 846).   "'If the allegations underlying the claims touch matters covered by the parties' contracts, then those claims must be arbitrated, whatever the legal labels attached to them.'" JLM, 387 F.3d at 172 (quoting Oldroyd, 134 F.3d at 77).

The arbitration clauses of the March Agreements are broad. The March 12 Agreement speaks of "any dispute aris[ing] in the future between" the brothers.  First Al-Essa Decl. Ex. B ¶ 7. The MOU in turn speaks of "any dispute arising in the future between [the brothers] related to the subject matter of this agreement."  First Al-Essa Decl. Ex. C ¶ 15.  We agree with plaintiff that the context of the March 12 Agreement and MOU

must be considered in interpreting the former's reference to
"any dispute." <u>See</u> Pl. Opp'n 22-23.  The arbitration clause of
the MOU, however, is itself broad and so plaintiff's claims are
presumptively within its scope.

The following allegations in the complaint are particularly
relevant to assessing whether the arbitration clauses can be
interpreted to encompass plaintiff's claims:

> This is a case of brotherly betrayal through
> industrial espionage designed to steal attorney-client
> privileged communications.  In the midst of a bitter
> family battle between [p]laintiff and his brother
> . . . over the break-up of their multi-billion dollar
> business empire, [d]efendants embarked upon a covert
> program of industrial espionage designed to undermine
> [p]laintiff's position and gain an unfair advantage in
> the ongoing negotiations and legal proceedings.

Compl. ¶ 1.

> As a result [of securing real-time access to
> plaintiff's strategic planning and legal advice],
> [d]efendants were able to derail the negotiations,
> assert and maintain their control over the brothers'
> joint assets and use them for their own benefit, and
> continue their strategy of trying to force [p]laintiff
> to take less than his fair share of the brothers'
> joint assets by denying him access to his assets and
> income.

Compl. ¶ 14.

> Plaintiff and [d]efendant Kutayba have been embroiled
> in a contentious and acrimonious dispute over the
> division of their assets ever since the [March
> Agreements] were entered into.  As a result,
> [p]laintiff was required to engage lawyers in the
> United States and Kuwait to protect [p]laintiff's
> interests and to represent him in negotiations with
> Kutayba . . . .  In the course of the negotiations and
> in preparation for the possibility of litigation with

respect to the brothers' underlying business disputes,
[p]laintiff repeatedly consulted his attorneys . . .
exchang[ing] numerous privileged communications
regarding the strategy to be followed in the
negotiations and litigation and the legal advice
regarding various aspects of the dispute. Almost all
of this legal advice was sent to and received by
[p]laintiff at his . . . email addresses that
[d]efendants Kutayba and Omar caused to be hacked into
. . . .

Compl. ¶¶ 42–44.

[Defendants and their agents] formed an association-
in-fact . . . for the common and continuing purpose of
implementing their scheme to steal [p]laintiff's
emails and the information contained in them, which
were used by Kutayba and Omar to assert and maintain
control of the joint assets belonging to [p]laintiff
and Kutayba.

Compl. ¶ 83.

The unlawful conduct of [d]efendants . . . has caused
[p]laintiff very substantial damages in an amount to
be proven at trial. Not only has [p]laintiff been
required to expend large amounts of money to
investigate the wrongdoing and attempt to protect his
confidential communications, but it has allowed
[d]efendants Kutayba and Omar to assert and illegally
maintain control over the brothers' joint assets,
parry all of his efforts to obtain his assets and
income and deprived him of the value of the legal
advice for which he paid substantial sums. This has
enabled Kutayba and Omar to prolong their campaign of
wrongfully barring [p]laintiff from the use and
enjoyment of his assets and is allowing them to
continue their wrongful use of [p]laintiff's assets
for their benefit. The losses [p]laintiff is
sustaining by reason of that campaign of obstruction
and self-dealing are in the many hundreds of millions
of dollars.

Compl. ¶ 113.

Against this backdrop, plaintiff argues that his claims do

not relate to the subject matter of the March Agreements,

asserting that these claims "neither implicate construction of the [March Agreements] nor present questions respecting the parties['] rights and obligations under [them]." Pl. Opp'n. 22 (internal quotation marks and citations omitted). Contrary to plaintiff's argument, the complaint's allegations clearly implicate the rights and obligations of the brothers pursuant to the March Agreements and so squarely relate to their subject matter. Plaintiff does not challenge defendants' claim that the "disputes" and "litigation" to which he refers throughout the complaint are "directly related to the division of his family's business and assets, which is the 'subject matter' of the [March] Agreements.'" Defs. Br. 6-7 n. 6. Regardless of what represents plaintiff's "fair" share of the commonly-owned property, see Compl. ¶ 14, the share to which he is legally entitled is that set in the March Agreements, which, as plaintiff acknowledges, govern "the division of the brothers' empire." Id. at ¶ 38. The email-hacking scheme, pursuant to plaintiff's allegations, is therefore easily comprehended as a coordinated endeavor to deny him his rights under the March Agreements. Moreover, in connection with each of his ten causes of action, plaintiff includes among his losses "the consequences flowing from the disclosure of privileged and confidential strategic legal advice." Id. at ¶¶ 121, 131, 145, 155, 162, 167, 172, 177, 183, 195. Assessing whether the compensatory

damages that result from these consequences amount to "many hundreds of millions of dollars," id. at ¶ 113, as plaintiff asserts, necessarily requires consideration of the terms of the March Agreements that alone determine the assets to which plaintiff is entitled and thus the value of plaintiff's allegedly compromised legal positions.

In his submissions, plaintiff attempts to recast his complaint by claiming that "the significant part of [his] injury . . . did not even have a relationship to business" because it "principally [consisted of] the invasion of privacy by stealing [plaintiff's] personal emails concerning family, health and medical matters." Pl. Opp'n 25. This representation is disingenuous at best. Viewing the complaint in the most favorable light to plaintiff, concern over the harm wrought by disclosure of such personal information is at best subsidiary and, in the context of all the allegations, largely an afterthought. See, e.g., Compl. ¶ 46 ("[p]laintiff also used these email addresses to conduct other confidential correspondence, including with respect to his medical and health matters and personal financial transactions, among other things"). Only two causes of action even raise disclosure of personal information and only do so after listing plaintiff's loss of "confidential and privileged communications with counsel." Id. at ¶¶ 175, 181.

Plaintiff further suggests that his claims lie outside the scope of the arbitration clauses because defendants' conspiracy arose independently from the contracts into which he and Kutayba entered. However, "a conspiracy which was formed _independently_ of the specific contractual relations between the parties" may prove within an arbitration clause's scope. JLM, 387 F.3d at 175 (emphasis in original).

In JLM, as plaintiff argues, the alleged conspiracy occurred prior to the formation of the contracts that contained arbitration clauses and impacted the price term in those contracts, which the Second Circuit emphasized directly gave rise to plaintiff's asserted damages and which is not the case here. See id. at 167-68, 175. In finding that the conspiracy was "in scope," however, JLM relied heavily on Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985), a case that it perceived to have also dealt "with a broad arbitration clause and the question of its applicability to a dispute resting on factual allegations which concern matters beyond the making of a particular contract between the parties and the performance of its terms." 387 F.3d at 175. Noting that the alleged conspiracy in Mitsubishi had similarly "implicated matters well beyond those relating to the [relevant] contract," 387 F.3d at 173, the Second Circuit in JLM relied on the Supreme Court's observation in "quite persuasive dictum"

36

that "'insofar as the allegations underlying the [federal statutory] claims touch matters covered by the [contract], the . . . Court of Appeals properly resolved any doubts in favor of arbitrability.'" Id. (quoting Mitsubishi, 473 U.S. at 624 n. 13). In Mitsubishi, the conspiracy at issue only arose after the relevant contract was entered into and did not therefore influence that contract's terms, which is precisely the case here.[16]  In light of JLM's reliance on Mitsubishi, JLM's background premise that independent conspiracies may lie within the scope of arbitration clauses is best interpreted to encompass the facts of this case.

Apparently appreciating the consequences of his complaint, plaintiff pursues a rather radical course, stating in his submissions that "he will not seek any damages in this action that depend upon the existence of the [March Agreements] and [agrees] to so stipulate." Pl. Opp'n 28. See also Bassam Decl. ¶¶ 4-7. As defendants argue, however, a plaintiff may not so amend his complaint through his motion papers. See Wright v. Ernst & Young L.L.P., 152 F.3d 169, 178 (2d Cir. 1998).

Plaintiff finally falls back on a "conclusory allegation that he did not intend for the arbitration clause[s] in [the

---

[16] In Mitsubishi, in 1979, a manufacturer, its affiliate, and a distributor entered into agreements to purchase and distribute cars.  473 U.S. at 617. In 1981, the distributor attempted to arrange for transshipment of cars that it was obliged to purchase, but the manufacturer and its affiliate refused permission.  Id. at 617-18.  This refusal and the reasons given for it provided the basis for the distributor's antitrust allegations.  Id. at 620.

March Agreements] to encompass [his asserted claims]." Oldroyd, 134 F.3d at 77.  See Bassam Decl. ¶ 3.  As in Oldroyd, however, here plaintiff "provides no basis for such a narrow construction of his agreement to arbitrate."  134 F.3d at 77.  As defendants note, "[i]t is well established that a court may not admit extrinsic evidence in order to determine the meaning of an unambiguous contract," Omni Quartz, Ltd. v. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002).  See Defs. Reply 8 n. 6.  Plaintiff's subjective intent, as articulated in his submissions, regarding the scope of the arbitration clauses is extrinsic evidence, resort to which is inappropriate because the arbitration clauses unambiguously encompass his claims.

While plaintiff fails to rebut the presumption that his claims are encompassed within the broad arbitration clauses, we need not rely on this presumption to reach our conclusion.  We find, as a matter of straightforward contract interpretation, that the complaint's allegations relate to the subject matter of the March Agreements and thus are within the scope of the arbitration clauses.

## 2. Kuwaiti Law

Plaintiff's claims are equally "in scope" pursuant to Kuwaiti law.  Article 173 of the Kuwaiti Civil and Commercial Code provides:

> The subject matter of the dispute shall be specified in the agreement on arbitration . . . even when the arbitrator is authorized to compromise and hold conciliation, otherwise the arbitration shall be deemed null and void.

First Al-Samdan Decl. Ex. E.  Interpreting this provision, the Kuwaiti Court of Cassation has held:

> [A]greements to arbitrate may be made regarding any disputes which arise out of the implementation of a contract in which case state courts cannot hear such disputes.  Therefore, the courts shall not be competent to examine disputes that the parties agreed to submit to arbitration.  This means that arbitration is an exceptional means of recourse, limited to the will of the parties.

First Nasser Decl. Ex. 14.[17]  It has further clarified that the subject matter need not be "specified in a special or designated manner" and that "it suffices to establish the premises within which the conflict takes places [rather than] the particular aspects of conflict for which the arbitration condition is provided."  First Al-Samdan Decl. Ex. K.[18]  In "discerning the contractual intent" of the parties to an agreement to arbitrate, however, the Kuwaiti Court of Cassation has made it clear that a court's "interpretation [must] hold[] to the contract's text and . . . not stray outside [its] explicit, comprehensive meaning."  First Ali Decl. Ex. M.[19]

Finally, in analyzing an agreement to arbitrate, the Kuwaiti Court of Cassation has stated that "litigants'

---

[17] Kuwaiti Court of Cassation, Decision No. 132/1996, Nov. 4, 1996.
[18] Kuwaiti Court of Cassation, Decision No. 441/1998, Feb. 1, 1999.
[19] Kuwaiti Court of Cassation, Decision No. 157/1993, Dec. 19, 1993.

orientation of the case does not restrict nor prevent the court from assimilating the case with its realities" and furthermore "affording the proper orientation to it based [on] what the court realizes in terms of [the] facts of the case [is] the application of the law."   First Nasser Decl. Ex. 15.[20]   We interpret this seemingly broad statement to encourage consideration of factual allegations as opposed to the legal framework in which parties arrange such allegations.

Here, there is no dispute between the parties that the specified "subject matter" of the arbitration clauses is "implementation of the [March Agreements'] division of the brothers' commonly-owned property."   Pl. Opp'n 16.   See First Al-Samdan Decl.  ¶ 47 ("the subject matter of the [March Agreements . . . is the division of family assets").   In light of the principles of Kuwaiti law discussed above, we agree with the defendants' assertion that the claims are within the scope of the arbitration clauses pursuant to Kuwaiti law "for substantially the same reasons that a court applying federal law would reach that conclusion."   Defs. Br. 19.   The parties agreed to arbitrate disputes related to the subject matter of the March Agreements, and as discussed above, plaintiff's claims are so related.   Plaintiff's position to the contrary is simply an ipse dixit without persuasive force.   See Pl. Opp'n 16.

---

[20] Kuwaiti Court of Cassation, Decision No. 690/2005, Mar. 19, 2005.

### D. The Arbitrability of the Asserted Claims

#### 1. Federal Law

We now must decide whether, notwithstanding the fact that plaintiff's claims are within the scope of the March Agreements' arbitration clauses, those claims are nonetheless nonarbitrable as a matter of law.  In the Second Circuit, "if federal statutory claims are asserted, [courts] must consider whether Congress intended those claims to be nonarbitrable." Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 75-76 (2d Cir. 1998).  It appears that courts have expressly found at least two of plaintiff's federal statutory claims to be arbitrable.  See Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 224 (1987) (civil RICO); TravelClick, Inc. v. Open Hospitality Inc., No. 04 Civ. 1224 (RJH), 2004 WL 1687204, at *5 n. 4 (S.D.N.Y. July 27, 2004) (Computer Fraud and Abuse Act).  While we have not found any precedent regarding whether claims under the Stored Communications Act and Wiretap Act are arbitrable, plaintiff does not appear to challenge the proposition. Instead, plaintiff advances two separate arguments to support the conclusion that the claims are nonarbitrable.  Both of these arguments turn on the interpretation of Kuwaiti law.

#### 2. "Kuwaiti Law" Argument #1

Plaintiff first argues that the Convention as ratified and enacted through Chapter 2 of the FAA bars arbitration of the

asserted claims because they are nonarbitrable pursuant to Kuwaiti law. Therefore, plaintiff contends that defendants' motion must be denied because:

> (1) the "differences" sought to be arbitrated are not "capable of being settled by arbitration" pursuant to Article II(1) of the New York Convention; and (2) the arbitration clause is "inoperative" and/or "incapable of being performed" in this case for purposes of Article II(3) of the [New York] Convention.

Pl. Opp'n 15.  See also Pl. Opp'n 2, 3, 5.

Plaintiff's argument turns on the interpretation of the Convention's text, Article II(1) of which provides:

> Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration.

Convention Art. II(1).  In turn, Article II(3) provides:

> The court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed.

Convention Art. II(3).

The weight of precedent squarely refutes plaintiff's position that foreign law should be applied to determine whether "a subject matter [is] capable of settlement by arbitration" pursuant to Article II(1).  In Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 639 n. 21 (1985), the

Supreme Court noted, "[w]e do not quarrel with the Court of Appeals' conclusion that Art. II(1) of the Convention . . . contemplates exceptions to arbitrability grounded in domestic law." See also In re U.S. Lines, Inc., 197 F.3d 631, 639 (2d Cir. 1999); Lindo v. NCL (Bahamas), Ltd., 652 F.3d 1257, 1266 (11th Cir. 2011).

While some uncertainty appears to persist as to whether domestic or foreign law governs whether an arbitration agreement is "inoperative or incapable of being performed" pursuant to Article II(3), we find that the most persuasive authority supports the use of domestic law for the rule of decision. In Rhone Mediterranee Compagnia Francese Di Assicurazioni E Riassicurazoni v. Lauro, 712 F.2d 50, 53 (3d Cir. 1983), the Third Circuit found "that an agreement to arbitrate is 'null and void' only (1) when it is subject to an internationally recognized defense such as duress, mistake, fraud, or waiver . . . or (2) when it contravenes fundamental policies of the forum state" and so domestic law. Though expressly addressing the phrase "null and void" in its conclusion, the Third Circuit's interpretation seems intended to address the entirety of Article II(3). See id. While this district and others in the Second Circuit have previously endorsed the Third Circuit's interpretation of Article II(3), see Oriental Commercial and Shipping Co., Ltd. v. Rosseel, N.V., 609 F. Supp. 75, 78

(S.D.N.Y. 1985); Apple & Eve, LLC v. Yantai North Andre Juice Co., Ltd., 610 F. Supp. 2d 226, 229 (E.D.N.Y. 2009), the Second Circuit does not appear to have addressed the question. Nonetheless, even in the absence of controlling authority, we find Rhone persuasive.   But see Bautista v. Star Cruises, 396 F.3d 1289, 1301-04 (11th Cir. 2005) (finding "an insufficient basis from which to conclude that this dispute cannot be arbitrated in the Philippines" but nonetheless entertaining "plaintiff's non-arbitrability argument [premised on Filipino law] as one founded in Article II(3)'s final phrase, 'incapable of being performed'").

Even if the contrary approach that plaintiff advances and Bautista were to govern here, the outcome would not change.   As discussed below, we do not agree with plaintiff's position that the asserted claims are nonarbitrable pursuant to Kuwaiti law.

### 2. "Kuwaiti Law" Argument #2

Plaintiff next argues that when "statutory" claims are at issue in an arbitration to be conducted overseas, the question arises whether a plaintiff can be compelled to arbitrate those statutory claims.   He asserts that well-established case law forbids compelling arbitration of his statutory claims because pursuant to Kuwaiti law those claims are nonarbitrable and so incapable of being vindicated in the arbitral forum.   See Pl. Supp. Br. 9-10.

The leading case regarding the issue of vindication is Mitsubishi, where the Supreme Court addressed concerns over whether a plaintiff would be able to vindicate federal antitrust claims in the arbitral forum of Japan.  See 473 U.S. at 637 n. 19.  Once assured that "American" law would provide the rule of decision, the Supreme Court noted, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."  Id. at 637.  In a footnote, the Supreme Court further observed:

> [W]e [need not] consider now the effect of an arbitral tribunal's failure to take cognizance of the statutory cause of action on the claimant's capacity to reinitiate suit in federal court. We merely note that in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.

Id.  Though dicta, this discussion of vindication in Mitsubishi was long ago recognized in the Second Circuit as the basis for inquiring into whether an agreement to arbitrate overseas would act as a prospective waiver of federal statutory claims.  See Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1364-66 (2d Cir. 1993) (adopting Mitsubishi dicta but finding English law permitted vindication of federal statutory claims).[21]

_____

[21] We note that plaintiff largely refers to vindication of his "statutory" as opposed to "federal" and "state" statutory causes of action.  See Pl. Supp. Br. 9-10.  In Mitsubishi, the Supreme Court did not expressly specify whether

In subsequent cases of the Supreme Court and the Second Circuit interpreting Mitsubishi, three principles have emerged that are of particular relevance here. First, where there is uncertainty over whether federal statutory law will apply in a foreign arbitral forum and whether foreign law, if applied, will prevent vindication of federal statutory claims, the resistance of plaintiffs to arbitration on that basis is premature. See Vimar Seguros y Reaseguros, SA v. M/V Sky Reefer, 515 U.S. 528, 539-41 (1995) (noting "[t]he relevant question . . . is whether the substantive law to be applied [in the foreign arbitral forum] will reduce [defendant's obligations] below what [the federal statute] guarantees" and emphasizing "mere speculation that the foreign arbitrators might apply [foreign] law which, depending on the proper construction of [the federal statute], might reduce [defendant's] legal obligations, does not in and of itself lessen liability under [that statute]"); JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 181-82 (2d Cir. 2004) (citing Vimar Seguros and finding vindication rationale premature).

Second, concerns over the anticipated ability (or lack thereof) of foreign arbitrators to apply federal statutory law do not provide grounds for avoiding arbitration. In JLM, the

_____

it was addressing federal or both federal and state statutory claims. See 473 U.S. at 636-37. Because Mitsubishi definitely addressed vindication of at least federal statutory claims, we will assume that it applies to federal statutory claims alone. Plaintiff has not cited any precedent suggesting an alternative interpretation. In any event, this assumption does not impact the outcome.

Second Circuit reiterated "the imperative" that it perceived in both _Mitsubishi_ and _Vimar Seguros_ "of avoiding the 'disparage[ment of] the authority or competence of international forums for dispute resolution.'"  387 F.3d at 182 (quoting _Vimar Seguros_, 515 U.S. at 537) (brackets in original).

_Third_, the burden of showing that a federal statutory claim is incapable of vindication lies with the litigant seeking to avoid arbitration.  See _Green Tree Fin. Corp.-Alabama v. Randolph_, 531 U.S. 79, 90 (2000) (citing _Mitsubishi_ and examining the record to determine whether evidence existed to support plaintiff's claim that arbitration costs effectively prevented her from vindicating federal statutory claims); _Guyden v. Aetna, Inc._, 544 F.3d 376, 386-87 (2d Cir. 2008) (citing _Mitsubishi_ and considering whether an arbitration agreement's discovery terms prevented plaintiff from vindicating federal statutory claims but finding plaintiff "has introduced no evidence that her fears are well-founded").  The dicta cited by plaintiff in _Ragone_ that "a federal court will compel arbitration of a statutory claim only if it is clear that 'the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum,' such that the statute under which its claims are brought 'will continue to serve both its remedial and deterrent function,'" does not alter the

allocation of this burden.   595 F.3d at 125 (quoting Mitsubishi, 473 U.S. at 637).

In this case, as in Mitsubishi, it appears that federal statutory law would govern the arbitration of plaintiff's statutory claims.   In Article 66, the Kuwaiti Civil Code provides, "[o]bligations arising from unlawful business shall be governed by the laws of the country in which the act giving rise to the obligation took place."   First Nasser Decl. Ex 3. Experts on both sides agree that federal statutory law would provide the rule of decision in the arbitration, although each side would like us to draw a different conclusion therefrom. Citing this provision, Ms. Ali, plaintiff's expert, asserts that the Kuwaiti Prime Minister would be obliged to arbitrate plaintiff's claims pursuant to federal statutory law because these claims, which Ms. Ali characterizes as "crimes and or tort committed in the US," are ones "which Kuwaiti law recognizes as subject to US law."   First Ali Decl. ¶ 28(d).[22]   Similarly citing this provision, Dr. Nasser, defendants' expert, asserts, "[i]f the dispute in question relates to a tort and such tort took place in [a] foreign country, the Kuwaiti judge or arbitrator would apply the laws of that foreign jurisdiction."   Second

---

[22] For this reason, Ms. Ali argues that "[i]t is inconceivable that the Prime Minister of Kuwait" has agreed to arbitrate the statutory claims.   First Ali Decl. ¶ 28(d).   Pursuant to Mitsubishi and the second of the three principles that emerge from its progeny, however, we refuse to disparage the ability of a foreign arbitrator to interpret and apply federal statutory law.

Nasser Decl. ¶ 28.  See also Second Al-Samdan Decl. ¶¶ 37-38.
To the extent that Dr. El-Kosheri, plaintiff's expert, disputes
this conclusion, his argument is unsupported.  See Second El-
Kosheri Decl. ¶ 20.

Notwithstanding plaintiff's agreement that federal
statutory law applies, he nonetheless argues for two seemingly
independent reasons that he would not be able to vindicate his
statutory claims because Kuwaiti law makes them nonarbitrable.
Pursuant to Vimar Seguros, we find plaintiff's arguments as to
how the Prime Minister of Kuwait or Kuwaiti courts will
interpret Kuwaiti law speculative and premature at least as to
his "public order" rationale.  Moreover, we find all of his
arguments lacking in substantive merit.

### i. Public Order

Plaintiff argues that Article 173 of the Kuwaiti Civil and
Commercial Procedures Code forbids arbitration of claims that
allege "intentional tortious conduct" or raise "issues of
criminal misconduct."  Pl. Supp. Br. 4, 6 (emphasis in
original).  The heated dispute between the parties on this point
concerns the scope of the concept of "public order" in Kuwaiti
law.  Article 173 states, "[a]rbitration may not be held in the
matters where a compromising conciliation [or 'solh'] may not be
reached."  First Al-Samdan Decl. Ex. E.  In turn, Article 554 of
the Kuwaiti Civil Code provides, "[r]econciliation [or 'solh']

49

is not possible in matters related to public order, but it is possible regarding financial rights arising therefrom." First Ali Decl. Ex. D.[23]  With regard to the meaning of "public order," among the materials submitted by plaintiff are excerpts of a treatise on Kuwaiti law, which observes:

> There is no doubt that the issues related to the foundations of the state's political, economical, social and moral systems are considered Public Order issues.  Because these foundations are developed by society . . . the idea of public order evolves.

First Ali Decl. Ex. E.[24]  Further explicating this abstract and fluid concept of public order, this treatise later continues:

> According to the doctrine of the contemporary procedural jurisprudence, we should distinguish between issues related to the public order in nature to be excluded from the scope of arbitration because they are of interest to the public order, and issues that touch the public order.  As the lat[t]er should not be excluded from the scope of arbitration at first, yet they should be excluded if a violation to a certain prescriptive provision occurred and was related to the public order.
>
> . . .
>
> There are some issues related in nature to the public order whereas there is no need to find out whether there is a particular provision related to the public order that has be[en] violated or not.  These issues are of interest to the public order because they aim to protect the high interests of the society.  For

---

[23] Plaintiff argues that Article 554's exception regarding "financial rights arising" from matters related to public order contemplates an initial adjudication of liability in those matters.  See Second Ali Decl. ¶¶ 23-25. It is not clear that plaintiff's interpretation is correct; however, defendants do not squarely address this particular contention in discussing the exception, see Third Nasser Decl. ¶¶ 16-19, and because we find that the claims do not relate to public order, we do not base our decision on this somewhat ambiguous provision.

[24] Azmi Abdel Fattah Attiya, Qanoon Al Tahkim Al Kuwaiti (1990).

example, the issues of status, capacity, personal
status, and crimes.

Id.  On what acts constitute "crimes," this treatise finally
explains, "[t]he crimes where arbitration is not permitted mean
the actions that are prohibited by the Criminal Law."  Id.

There is no suggestion here that the asserted claims
involve "issues of status, capacity, [or] personal status."
Therefore, the asserted claims may relate to the public order
pursuant to Article 554 only if (i) they implicate issues that
"touch" the public order and a prescriptive provision is
violated that relates to the public order or (ii) they are
crimes articulated in Kuwaiti law.

With regard to the first inquiry, we agree with plaintiff
that civil claims may relate to public order.  See Pl. Supp. Br.
5; Second Ali Decl. ¶ 11.  Ms. Ali quotes facially supportive
language from a passage in the treatise discussed immediately
above that provides that arbitration is not permitted for a
"dispute that arises from violating a human right of an
individual over the integrity of his body[] or  violating a
right that protects [an individual's] privacy."  First Ali Decl.
Ex. E.  See Second Ali Decl. ¶ 15.  The only underlying right,
however, to which Ms. Ali directs this Court is "the prohibition
on '[s]olh' in the case of liability relating to future torts as
set forth in [A]rticle 254 of the [Kuwaiti] Civil Code," which

"prohibition is a matter of [p]ublic [o]rder."  Second Ali Decl. ¶ 17 (emphasis in original).

Article 254 of the Kuwaiti Civil Code provides, "[a]ny agreement signed prior to the occurrence of the illegal act that has the effect of exonerating liability arising from the tort, either in whole or in part will be void."  First Ali Decl. Ex. D.   Arbitration, however, does not inherently involve exoneration of liability and the March Agreements do not purport to limit any substantive rights.  Ms. Ali's argument that losing procedural rights is akin to exonerating liability is not persuasive.  See Second Ali Decl. ¶ 31 n. 5.  Beyond Article 254, Ms. Ali references no other support for her argument.

With regard to the second inquiry, we initially emphasize that any argument that as a matter of federal or state statutory law the Kuwaiti Prime Minister would be obliged to determine the existence of a crime or assess criminal liability in arbitrating plaintiff's civil claims is unsupportable.  See Second El-Kosheri Decl. ¶¶ 9-13.  Pursuant to federal and state statutory law, the issues raised in plaintiff's causes of action are not, in the words of a treatise quoted by Dr. El-Kosheri, within "'the exclusive jurisdiction of the criminal justice system.'"  Second El-Kosheri Decl. ¶ 10.

We further find that the only Kuwaiti penal provision that plaintiff cites does not support his position.  "Law No. 9 of

2001 Regarding the Abuse of Telephones And Wiretapping Devices," which both Ms. Ali and Dr. El-Kosheri reference, <u>see</u> First Ali Decl. ¶ 28(e); First El-Kosheri Decl. ¶ 40, and which provides for prison sentences, certainly appears to be a criminal law. However, the law, based on its title and content, appears limited to the abuse and wiretapping of spoken communications over the telephone alone.[25]   Contrary to Ms. Ali's implication, <u>see</u> First Ali Decl. ¶ 28(e), and plaintiff's simple assertion, <u>see</u> Pl. Opp'n 15 n. 11, we find that the law is not facially applicable to the email-hacking scheme.[26]

Thus plaintiff has not demonstrated that his claims relate to public order.

---

[25] The law's title, "Regarding the Abuse of Telephones And Wiretapping Devices," does not suggest so broad a scope that would naturally encompass an entire swath of electronic communications but rather refers to a physical device used for spoken communications.   First Ali Decl. Ex. L.   The law's content appears even more strongly to counsel for a narrow interpretation. While the law does refer to "any method of telephonic communications," which is somewhat ambiguous, it also discusses the use of wiretapping devices "to record or transmit conversations made using a communications device" and the erasure and destruction of "any recordings" illicitly made.   <u>Id.</u>   The law also regulates the transmittal of "[i]nternational calls from and to the state of Kuwait."   <u>Id.</u>

[26] We note that this conclusion does not alter the consensus of the parties and this Court that federal statutory law would govern in any arbitration in Kuwait.   While Article 66 of the Kuwaiti Civil Code provides that "[o]bligations arising from unlawful business shall be governed by the laws of the country in which the act giving rise to the obligation took place" it qualifies this statement with the assertion, "[h]owever, the provision of the preceding paragraph shall not apply to incidents taking place abroad and which are lawful in Kuwait even [though] they were considered unlawful in the country in which they took place."   First Nasser Decl. Ex. 3.   We interpret this article to provide that Kuwaiti law must <u>affirmatively</u> make certain conduct lawful for the article's exception to apply and assume that email hacking is not so blessed.

## ii. Future Torts

Plaintiff next argues that Article 173 does not permit arbitration of future torts.  See Pl. Supp. Br. 6.  In relevant part, Article 173 provides, "[a]greement may be made on arbitration in a specific dispute and on arbitration in all disputes arising from the implementation of a certain contract." First Al-Samdan Decl. Ex. E.  Both parties agree that the arbitration clauses of the March Agreements are of the latter permissible variety.  Stripping away layers of conclusory statements and cross-references, plaintiff essentially argues that a future tort cannot qualify as a dispute arising from the implementation of a certain contract.  In support of this position, plaintiff relies on Ms. Ali's statement:

> [A]n agreement [to arbitrate all disputes that arise from the performance of a specific contract] necessarily refers to the disputes arising from performance of contractual obligations of [the] specific contract because agreements to arbitrate must relate to disputes arising from an existing legal relationship relating to a financial interest capable of disposition, in this case contractual.  These do not include crimes or torts, as these are not disputes that arise from the performance of contractual obligations of a specific contract, but rather from violations of the law and duty of care imposed by the law.  Prior to the occurrence of a crime or a tort, the parties have no legal relationship relating to a financial interest arising from the tort or the crime that can be the subject matter of [an] arbitration agreement.

First Ali Decl. ¶ 10.  Ms. Ali does not cite any authority for her conclusion that future torts are nonarbitrable.

Article 173 does not require or even appear to encourage such an interpretation. For instance, it provides that an arbitration agreement specify "[t]he subject matter of the dispute" that it will govern. First Al-Samdan Decl. Ex. E. Requiring identification of the subject matter of the dispute appears to invite arbitration of any dispute that both pertains to that subject matter and can be said to arise from implementation of the relevant contract, regardless of the underlying cause of action. A future tort that frustrates performance of a contract seems to be no less a dispute arising from implementation of the contract than a disagreement over that contract's terms. Ms. Ali, however, ascribes a definition to "arising" that would restrict the scope of disputes as a matter of law to causes of action based in contract alone. Her interpretation would appear to encourage avoidance of arbitration agreements through artful pleading of contract claims as tort claims, a possibility that further weighs against plaintiff's position, which appears artificially constraining.

Ms. Ali's citation to Article 254 of the Civil Code, see First Ali Decl. ¶ 10, for the proposition that future torts are nonarbitrable is equally unavailing. As already discussed at pages 51 to 52, we reject plaintiff's argument that arbitration of future torts violates Article 254.

Accordingly, plaintiff has failed to carry his burden of showing that his federal statutory claims are nonarbitrable pursuant to Kuwaiti law and so cannot be vindicated in the arbitral forum.[27]

### E. The Stay of This Action Pending Arbitration

Pursuant to both federal law and Kuwaiti law all of plaintiff's claims against Kutayba are arbitrable. Accordingly, a stay of these claims pursuant to 9 U.S.C. § 3 is required. Pursuant to Kuwaiti law, however, Omar's and Waleed's status as non-signatories renders plaintiff's claims against them outside the arbitration clauses of the March Agreements. We therefore must decide whether to exercise this Court's inherent power to manage its docket and also stay these nonarbitrable claims pending arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 n. 23 (1983) (observing "[i]n some cases, of course, it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket"). See also WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 76 (2d Cir.

---

[27] In addition to the theories of public order and future tort, plaintiff also argues that the Kuwaiti Prime Minister would have to refrain from arbitrating the asserted claims because they lie outside his permitted jurisdiction pursuant to Kuwaiti law. See Pl. Supp. Br. 6. This argument, however, is little more than an assertion that pursuant to Kuwaiti law plaintiff's claims are outside the scope of the arbitration clauses in the March Agreements. See Second Ali Decl. ¶ 32(b); Second El-Kosheri Decl. ¶¶ 16-18. For the reasons discussed above, that premise does not withstand analysis.

1997) (staying suit pending arbitration and noting "district courts . . . may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants") (internal quotation marks omitted).

In the context of a stay pending arbitration, the Second Circuit has held that the movant must demonstrate that a stay is merited.  See id.  The movant must initially establish that "there are issues common to the arbitration and the court proceeding," and that "those issues will be finally determined by arbitration."  American Shipping Line, Inc. v. Massan Shipping Indus., Inc., 885 F. Supp. 499, 502 (S.D.N.Y. 1995) (citing Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991)).  If this requirement is met, then "the moving party [must show] that [it] will not hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that such delay that may occur will not cause undue hardship to the non-moving parties."  Id. (citing Sierra, 937 F.2d at 750).  A stay is "particularly appropriate" where it "promote[s] judicial economy, avoidance of confusion and possible inconsistent results."  Birmingham Assocs. Ltd. v. Abbott Labs., 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008).

Here, the claims against Kutayba, Omar, and Waleed are largely identical, and the judicial economy achieved in awaiting

the resolution of issues in arbitration may prove considerable. More specifically, in the Second Circuit, the doctrine of collateral estoppel has long been applied to arbitrator's decisions, see Goldstein v. Doft, 236 F. Supp. 730 (S.D.N.Y. 1964), aff'd, 353 F.2d 484 (2d Cir. 1965), cert. denied, 383 U.S. 960 (1966) (finding collateral estoppel applicable where defendant was not a party to arbitration proceedings in which plaintiff was given a full opportunity to litigate issues), and the effects of foreign arbitration are no less preclusive than domestic arbitration.  See Weizmann Inst. of Sci. v. Neschis, 421 F. Supp. 2d 654, 676-683 (S.D.N.Y. 2005) (finding plaintiffs collaterally estopped from re-litigating issue decided in arbitration proceedings in Lichtenstein).  Omar and Waleed may thus be able to defensively deploy any favorable arbitral determinations to collaterally estop plaintiff from re-litigating the same issues in this action.  See Orange Chicken, L.L.C. v. Nambe Mills, Inc., No. 00 Civ. 4730 (AGS), 2000 WL 1858556, at *9 (S.D.N.Y. Dec. 19, 2000) ("binding arbitration of the claims [between signatories to a contract containing an arbitration clause] will likely provide significant insight into, if not actually resolve, the [related] claims asserted in this action" between a signatory and non-signatories).  See also Argus Media Ltd. v. Tradition Fin, Servs. Inc., No. 09 Civ. 7966 (HB), 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009) ("numerous

courts have held that where arbitrable and non-arbitrable claims arise out of the same set of facts, a stay usually is appropriate because the arbitration may decide the same facts at issue in the litigation").

Moreover, there is also no indication that Omar and Waleed will impede the progress of any arbitration and similarly no indication that the arbitration itself will not proceed in a reasonable time.  Finally, a stay does not create undue hardship for plaintiff.

With that said, under the precedent of the Second Circuit, "[a] stay may provide that [a plaintiff] may move to vacate the stay if [a defendant] impedes the arbitration process, or if the arbitration does not conclude within a reasonable time." WorldCrisa, 129 F.3d at 76.  This Court expects that the parties will in good faith proceed to arbitration, and plaintiff may seek an order vacating this stay should defendants hinder the expeditious commencement and completion of arbitration.

## IV. Conclusion

For the reasons discussed above, defendants' motion to stay is granted, and this action is stayed as to the moving defendants pending arbitration.


Dated:     New York, New York
           November 28, 2011

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on
this date to the following:

Attorneys for Plaintiff
Bassam Y. Alghanim:
John L. Gardiner, Esq.
Jeffrey Glekel, Esq.
Timothy G. Nelson, Esq.
Skadden, Arps, Slate, Meagher & Flom L.L.P.
4 Times Square
New York, NY 10036

Michael Zweiback, Esq.
Nixon Peabody L.L.P.
555 West Fifth Street, 46th Floor
Los Angeles, CA 90013

Attorneys for Defendants
Kutayba Y. Alghanim and Omar K. Alghanim:
Richard F. Schwed, Esq.
Henry S. Weisberg, Esq.
Christopher R. Fenton, Esq.
Shearman & Sterling L.L.P.
599 Lexington Avenue
New York, NY 10022

Attorneys for Defendant
Waleed Moubarak:
Tai H. Park, Esq.
Barry Junker, Esq.
Park & Jensen L.L.P.
630 Third Avenue
New York, NY 10017